## Gilchrist *v.* Hartley.

*Practice, Supreme Court—Assignments of error.*

The Supreme Court will not consider as a ground for reversal a detached sentence in the charge of the court, where it appears from the charge that the sentence complained of was not expressive of the opinion of the judge, but was a statement of the plaintiff's contention.

*Negligence—Loss of boats—Defective moorings.*

In an action to recover damages for the loss of coal barges and their cargo sunk by a fleet of the defendant's barges, a verdict and judgment for plaintiff will be sustained where the evidence tends to show that the fleet of the defendant moored at a landing was too large for the stage of the water at the time, and that it was not securely fastened.

Argued Oct. 24, 1900. Appeal, No. 117, Oct. T., 1900, by defendants, from judgment of C. P. No. 2, Allegheny Co., Oct. T., 1898, No. 270, on verdict for plaintiff, in case of J. O. Gilchrist, H. Gilchrist and J. J. Gilchrist, trading as J. M. Gilchrist's Sons, v. Charles Hartley and Beecher Hartley, trading as Hartley Brothers. Before McCOLLUM, C. J., MITCHELL, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Trespass to recover damages for the destruction of coal barges and their cargoes. Before WHITE, P. J.

The facts appear by the charge of the court which was as follows:

This is an action based upon alleged negligence of the de-

fendants. The plaintiffs had a fleet of coal flats and boats on the Allegheny side of the Allegheny river, and the defendants had a similar fleet of coal flats and boats higher up the river. According to the evidence there were about 125 or 150 feet between the head of the plaintiffs' fleet and the stern of the defendants' fleet.

On Sunday, March 20, 1898, the river began to rise, and continued to rise on Sunday, Monday, Tuesday and Wednesday. I believe on Tuesday evening there was a rise in the river of about twenty or twenty-one feet. On Wednesday morning it had risen some six feet or so, and was about twenty-seven feet high.

On the morning of Wednesday, the 23d of March, the defendants' fleet broke loose from its mooring, drifted down the river, struck the plaintiffs' fleet and broke it loose from its moorings; and, according to the evidence, the plaintiffs lost a good portion of their fleet, including coal and other property.

If the fleet of the defendants broke loose from the negligence of the defendants, they would be liable to the plaintiffs and liable to pay to the plaintiffs all the damage that they sustained in consequence of striking their fleet and breaking it loose from its moorings. If there was no negligence on the part of the defendants, of course there is no liability to the plaintiffs.

What is negligence? It is doing something which an ordinarily prudent man would not do under the surrounding circumstances, or neglecting to do something which an ordinarily prudent man would do under the circumstances. The surrounding circumstances include not only what existed at the time, but the reasonable probabilities of the future. Men are bound to anticipate what may reasonably happen and provide against that. The defendants were bound to furnish skilful, competent men in charge of their fleet, especially when there was high water and a large fleet. If they failed to furnish skilful, experienced men in charge of the fleet, it would be a neglect of their duty, and that in law is negligence. That would be the personal negligence of the defendants,—if they failed to supply and have on the fleet skilful and competent men in charge of it. But the defendants are liable for the men that were employed, not only the fleet boss, who according to the evidence, had charge of the fleet, but if the fleet boss, or the

men employed on the fleet, were guilty of negligence, in law it is the negligence of the defendants, because they were their servants.

The contention on the part of the plaintiffs is that there was negligence in having such a large fleet at that time, and especially with the outside flats loaded with coal. [There was too much of a breast on a high water, catching so much of the current of the stream, and, of course, increasing the strain upon the lines.] [1] Also if there was not sufficient number of lines on the boat to meet an emergency, that would be the negligence of the defendants themselves, because they would be bound to furnish whatever would be reasonably necessary in the case of an emergency. Another ground of contention upon the part of the plaintiffs as to negligence is, that there was too much dependence upon post No. 3. The two wire ropes as I understand were fastened to the post No. 3; there were some lines on No. 2, also, and some lines fastened to rings, but the main dependence, as I understand from the testimony, were upon the wire ropes that were fastened to post No. 3. I may say, gentlemen, that you will not take the testimony from me. You will take your own recollection of it, and I do not intend to go into detail over the testimony. Very able counsel have done that. I merely group together the grounds of contention in this case and call your attention to what especially you should direct your thoughts to. Another ground of contention on the part of the plaintiffs, in reference to negligence, is that when the water was so high and the drift accumulating in front of the fleet, it was negligence to permit the lines to get under that drift, thus increasing the strain upon those lines, because the lines would have to hold not only the fleet but also have to hold the drift that was above. And another ground of contention is, that it was negligence doing nothing to relieve this strain upon those lines, contending that there should have been additional lines sent out, and it is contended that there were other posts where additional lines might have been fastened. Especially it is contended that on that high water and when the river was still rising, with that large fleet and the drift extending so much in front of it, some of the outside flats—and those were the loaded ones—ought to have been dropped down, thus decreasing the front of the fleet and, of course, relieving, to a cer-

tain extent, the strain upon those lines. Also, that there was no difficulty in reducing the front of that fleet, because there was a steamtug there between 4 and 5 o'clock on Tuesday evening that could have taken some of those barges or flats and either removed them somewhere else or dropped them down to the rear of the fleet. These are the main grounds claimed for negligence on the part of those in charge of the fleet.

Now, on the part of the defense it is contended that the men in charge of it there did all that could be expected of ordinarily prudent men, under the circumstances. The men in charge of the fleet would not be bound to anticipate some extraordinary event that could not and would not reasonably be expected to occur, but they would be bound to anticipate what might reasonably be expected. The contention of the defendants is that these men, especially the float men—did all that they believed to be necessary and proper under the circumstances. It is not what they believed, but what an ordinarily prudent and skilled man would have done and anticipated. If the fleet boss was not an experienced, skilful man, he might think it was perfectly safe, and yet an ordinarily prudent man, a skilful man, might have thought otherwise, and might have done otherwise. Another ground is that the river had been rising from Sunday, and on Tuesday evening it was still rising, but they did not expect a rise of more than a foot or so during the night, and about midnight, or later, it began to rise very rapidly, in consequence of rains up the river, and rose very rapidly from that until about 5 o'clock, when the fleet broke loose. Another ground is, that in consequence of the dam on the Pittsburg side the current in the river had been changed, and had been thrown over to the Allegheny side, and that that brought over the drift that was there. Another ground is, that just before the fleet broke loose some wreck was floating down the river in a very swift current, according to all the evidence at that time, and the contention is that that drift—sunken coal boat or something of the kind—struck the defendants' fleet and broke loose its moorings.

These are about the contentions of these two parties, gentlemen, and it is for you to pass upon all the evidence here bearing on the question whether that fleet broke loose through the negligence of the men in charge of it. If it did, then the plain-

tiffs are entitled to recover all their loss in consequence of it. If there was no negligence then, if it was such an unforeseen event, extraordinary, not to be anticipated reasonably, then there is no liability for the accident.

Verdict and judgment for plaintiffs for $5,788.92. Defendants appealed.

*Errors assigned* were (1) portion of charge as above, quoting it; (2) the court's charge emphasized too strongly the contentions of the appellees, and did not give the contentions of the appellants nearly equal emphasis and consideration, and the charge of the court was too meager on the testimony of the defense.

*W. F. McCook* and *D. R. Jones*, for appellants, cited as to the charge: Larzelere & Son v. Tiel & Tooley, 3 Pa. Superior Ct. 109; Gehman v. Erdman, 105 Pa. 371; Lerch v. Bard, 177 Pa. 197; Young v. Merkel, 163 Pa. 513; Steinbrunner v. Pittsburg, etc., Ry. Co., 146 Pa. 514; Winters v. Mowrer, 163 Pa. 239; Wenrich & Co. v. Heffner, 38 Pa. 209; Collins v. Leafey, 124 Pa. 203; Work v. Maclay, 2 S. & R. 415; Hershey v. Hershey, 8 S. & R. 333; Bughman v. Byers, 21 W. N. C. 494; Spear v. P. W. & B. R. R. Co., 119 Pa. 61; New York, etc., R. R. Co. v. Enches, 127 Pa. 316; Webb v. Lees, 149 Pa. 13; Catasauqua Mfg. Co. v. Hopkins, 141 Pa. 30; Garrett v. Gonter, 42 Pa. 143; Farley v. Ranck, 3 W. & S. 554.

*W. B. Rodgers*, for appellees.

PER CURIAM, January 7, 1901:

The only question for the determination of the jury was whether the defendants' negligence was the cause of the plaintiffs' loss. The burden of establishing the negligence of the defendants was on the plaintiffs, and having succeeded in that, it was necessary for them to show that the negligence was the cause of their loss. The testimony, if credited, was sufficient to warrant a verdict and judgment for the plaintiffs. A verdict was rendered in their favor and a judgment was entered thereon, and from that judgment so entered, this appeal was taken. Two specifications of error were filed and neither of

them afforded, in our opinion, any ground for a reversal of the judgment. The first specification was founded upon a sentence from the charge in the following words: "There was too much of a breast on a high water, catching so much of the current of the stream, and of course increasing the strain upon the lines." A reference to that part of the charge from which the sentence was taken was not expressive of the opinion of the judge but was a statement of the plaintiffs' contention. The second specification hints at inadequacy in the charge with an intimation of partiality in the instruction to the jury. It seems to us, however, that the charge was impartial and fair. The specifications are therefore overruled.

Judgment affirmed.